The first case on our calendar is one of two tandem cases. This is Emily Derogatis v. Board of Trustees, and this is of the Welfare Fund, correct? Yes, thank you. Would you please proceed? May it please the court. My name is Robert Libros, counsel for appellant Emily Derogatis. These two cases arise out of, because Emily Derogatis went down to the local 15 Welfare Fund office in New York, trying to make sure that her husband's pension application was in order, his application to the Central Pension Fund. He was an operating engineer here in New York, a member of Local 15. He received his pension benefits from the Central Pension Fund in Washington, and he received health coverage from the Local 15 Welfare Fund here in New York. Back in March, first, excuse me, in January of 2011, Mr. Derogatis was diagnosed with inoperable lung cancer, and he continued to work. In March, he and his wife went down to the Local 15 offices and the Welfare Fund offices, where they spoke with, introduced to Patrick Keenan, the head staff person of the Welfare Fund office. And Mr. Keenan discussed both pension and welfare fund eligibility with Mr. Derogatis when he was ready to retire. And the reason was, Mr. Keenan had called the Pension Fund office in Washington, told them the Derogatises were coming in, and the Pension Fund sent them a benefit statement with a retirement date of April 1st, which how much Mr. Derogatis might get under different forms of his pension. The Pension Fund authorized a worker to elect a 75 or 100% survivor benefit. The 100% was the largest survivor benefit that the Pension Fund provided. And so they had a discussion, and then Mr. Keenan sent them a confirmation letter. Mr. Libous, I think we understand the facts. I mean, we've read the briefs. The facts, I understand, are confusing in certain respects, but I think we're on top of the case. I'll get right to the point about the Welfare Fund case. The district court granted summary judgment to the Welfare Fund on the ground that the speaker, Mr. Lopez, who was not, or Mr. Keenan, were not fiduciaries. In August, Mr. Lopez had told Mrs. Derogatis that if she filed his retirement papers, he would lose, her husband would lose his health benefits if he wasn't 62 or didn't have a Social Security Disability Award. This was inherently misleading and coercive. No person taking care of a dying spouse could do anything but listen and rely. When you use the word coercive, it suggests he was trying to force something. It wasn't intent. No, no, no, no. It was, no, there was nobody, nobody claims that Mr. Lopez had any bad intent. It was, it was nobody listening. It was such, nobody hearing this, taking care of a dying spouse, could do anything but listen to him. He was just speaking about health benefits, right? And your allegation is that he gave incomplete information. He told her about the, well. In two sentences, he first talked about health care, but he also told, warned her against filing the pension application. She went there to make sure the pension application was in order. Yes, but he warned her about. He warned her not to file the pension application. He did that because. Yes, that's right. His understanding of the medical benefits. That's right, that's right. And what he told her about the medical benefits. And on the medical benefit issue, the, in the medic, in this case, the harder issue, which the district court never got to, is remedies. Can you get, make whole relief? Well, yeah, this is a question I wanted to ask you about, which is in the suit against the welfare fund, your, I take it your claims, if successful, what you want is damages from the welfare fund in the amount of the lost pension benefits. That's correct. And in the suit against the pension fund, you're asking for the pension. That's right. Because only the pension fund would have the responsibility to pay the pension. But you're saying against the welfare fund. It would be damages. It would be damages. In the amount of the pension. In the amount of the pension. For one more final thing, of course these remedies are alternative remedies. That's correct. No double recovery. And the damage award then would be for the 50% that has not been paid of the pension. But it would be in form of, you have to cast it as equitable relief, a kind of surcharge, is that right? It would be surcharge. And as Judge Lynch, sitting in the Amara case on remand, recognized, when the Supreme Court in Amara talked about make whole relief, Justice Breyer wrote that. Nine years earlier in Davila, in the Supreme Court case of Aetna versus Davila, that was a preemption case in which the court ruled that a claim of negligence against a doctor for not prescribing medicine had a state law claim. It went to the Supreme Court. The court ruled the claim preempted. But Justice Ginsburg concurred. Justice Breyer joined that opinion. And they cited John Langbine of Yale. You're well acquainted with him. One of the nation's leading authorities on trust law and ERISA law. He wrote, and Justice Ginsburg cited Langbine's article, the Supreme Court's trail of error in Russell and Mertens and Great West, and pointed out how under trust law damages were awarded every day for surcharge for consequential damages for a trustee's breach of a fiduciary duty. And that's what the Supreme Court had intended. What's the strongest case you have where that actually happened, that a claim fiduciary was held responsible for such kind of remote collateral consequences? After Amara, that law has not been fleshed out yet. We haven't seen cases coming up to the circuit where consequential damages have been awarded. When cases have gone to the circuit, as in this court about two years ago, where a district court had stated that damages or equitable relief did not include money awardable, the court reversed and pointed to Amara. The law is not clear yet on that. But Langbine points out that in trust law, consequential damages are awarded every day for a trustee's breach of fiduciary duty. But here the breach would be in misdescribing the welfare fund, and the consequence would be that she gets pension benefits because it caused her to make another choice. It caused her not to file the application, which they were aware of. And one last quick point before I sit down. The Kenan letter, had she looked at the letter in August, Kenan would have confirmed what Lopez told her, because Kenan stated if you elect to retire, provided that you are 62 or have a social security disability award, your medical benefits will continue. That's what Lopez told her. He said provided, the implication clearly being if you're not 62. What would happen if someone retired in the normal course, age 65, whatever, whatever is the retirement age under the plan? What would happen? Would there be retirement medical benefits? The two plans have different requirements. The welfare fund has, I think, age 65, has 25 years of service to then continue your medical benefits in retirement. Mr. DeRogatis didn't qualify for retiree benefits under the medical fund. So is it not literally accurate but misleading, but literally accurate, that if you retired early, you would eventually lose medical coverage? The problem is the medical coverage that you have earned continues, right? As specifically applied to Mr. DeRogatis, he would have continued to receive medical benefits through the following April, whether he retired or not, because he had earned them. After that, that would cease. I'm going to lay something out, and I may be wrong about five things, so wait and tell me all the things I'm wrong about. By April, at April, he would run out of earned medical benefits, but a COBRA would be available for another 18 months. If he survived those 18 months after April, at that point, he would not any longer be eligible for medical benefits under the plan. Is that roughly correct? That's right, Your Honor, and you are correct in saying it's misleading because she told... Well, what's misleading is, of course, as applied to the particular circumstances of Mr. DeRogatis, faced coldly and rationally and recognizing that his wife might be hoping for a miracle, the likelihood was that he would not survive the expiration of medical benefits. So that it was not perhaps a wise bit of advice to say in this particular case that it was a mistake to retire. That's correct because she had told Mr. Lopez that my husband's in the hospital, he has inoperable cancer, and he wants to retire. The agent, Mr. Lopez, knew. So, I mean, another thing that might be considered misleading is when you say if you retire, you will lose the medical benefits. Well, maybe it's true that you would lose them eventually, but the impression that someone hearing it might take away is that it terminates immediately. That's in fact what happened because the record shows she immediately went into, when she signed up for disability, signing her husband up for disability benefits, she told the lady helping her, my God, I'm glad I came here. If I'd sent the application in, we would have lost our medical. That's what she understood this to mean. I see that I've gone over my time, and I'd like to reserve some time for- You have three minutes for rebuttal. For rebuttal, yes. And then we'll have the second argument as well, so. Yes, and I'd like, in my brief, I pointed out how the Varity case points, describes fiduciary functioning, and I will address that on rebuttal if necessary, Your Honor. Very good. Thank you very much. You're welcome. Mr. Steinberg. Good morning, Your Honors. My name is James Steinberg, along with my colleague, Joseph Green. We represent the appellees, the Local 15 Board of Trustees. Before I go into my formal comments about the basis for the decision of summary judgment and Judge McMahon's decision not to grant the appellant's application for reconsideration, I do want to address a factual question that my adversary just brought up. At no time is there anything in the record that identifies or states that Mrs. DeRogatis advised Mr. Lopez, in their July or August 2011 meeting, that her husband was suffering from inoperable cancer. Instead, the record shows that the first time that she ever took into consideration or recognized that her husband's condition was unfortunately terminal was early September of 2011. Instead, Mr. Lopez's testimony is that the focus upon their discussion in the foyer at the fund office was about health coverage, and from there, obviously, the case rolls into the facts that Judge McMahon relied upon for purposes of granting my client's summary judgment. With regard to that summary judgment motion, the judge properly found that the appellee's employee, Mr. Lopez, was not a fiduciary under ERISA because he neither had nor exercised the authority and responsibility under Section 321A of ERISA. I'm puzzled as to why that matters, whether he's a fiduciary, in a couple of respects. One, I don't know that anything in this case turns on a special fiduciary responsibility. If someone, unless perhaps we're talking about a negligent misrepresentation, is that the idea that only a fiduciary would be liable for negligent misrepresentation? As I understand the Talker decision, which Judge McMahon relied upon in reaching her decision, is the threshold issue is determining whether or not the employee who has ministerial duties, as we articulated in our brief, does something or is granted certain authority that provides him with the status of a fiduciary. Yeah, but why? I mean, the fund has a fiduciary responsibility, and it's not even—the responsibility I'm thinking of is not even a fiduciary responsibility. It's not about the duty to put the beneficiary first. It's a duty imposed by statute to provide accurate and clear information about what the plan provides. I think—isn't that the duty that's in question? That is the duty—absolutely, that's the duty in question. And that's a duty that the fund has. Now, if the fund provides, for example, an unclear SPD, and on top of that says, if you have any questions, come see this person, and that person gives misleading information, why does it matter that the person to whom the fund delegated the responsibility of clarifying a confusing SPD— and I recognize you're going to have an issue about whether it's confusing— why—assume for the sake of the argument for the moment that the SPD is not clear, and the fund has said, if you need information, go see, in effect, Mr. Lopez, and Mr. Lopez fails to clarify and, in fact, gives the wrong answer about what the fund provides, why hasn't the fund reached that duty, regardless of whether Lopez counts himself as a fiduciary? And I don't—I would not disagree with that analysis under a State of Becker. Those are the two components that Judge McMahon focused upon on her—in connection with the reconsideration application. Well, if that's so, let me focus on the SPD because of a question of clarity. On—I guess it's Joint Appendix 669, page E-8 of the SPD, we have what I would regard as pretty unambiguous language under the heading Eligibility Requirements for Members Who Elect Early Retirement. That's the language you're relying on, right? Correct, Your Honor. Now, the problem is, if you look at the whole context, if you looked just at that, you might say, well, that's tolerably clear, certainly to a lawyer it is, whether it might be to a layperson or not. In fact, both sides agree that it's so clear that you don't—there's no dispute about what it means, right? Correct. But if you look at the thing in context, that heading is Eligibility Requirements is in a certain size font. If you look back to page E-5, there is a much larger heading that says 15D, Eligibility. Am I right that 15D refers to a different local than the one that Mr. DeRogatis belonged to? Correct, a different division of Local 15. He's in Local 15. And there are different benefits depending on—and different eligibility rules depending on if you're in 15, 15A, 15C, 15D. Correct. But now you've got this big heading 15D, Eligibility. And then you go on, and there are lots of things that say they're about 15D. Then there's something about Reciprocity, which relates to all the different divisions. But at the same time, it's also about 15D. And then you come to the same headings about members who elect Normal Retirement and Early Requirement. Why wouldn't a person think that this is still the 15D section? Why would you even be looking if you're looking at this extremely long, no table of contents, no index, no cross-reference plan? Why wouldn't a reasonable person think that we have switched from E-1, Eligibility, to E-2, 15, 15A, Eligibility, to E-3, 15C, Eligibility? All of these—I can't tell you how many points it is, but it's a rather large font. Then on E-5, 15D, Eligibility. And then you never get another heading of that size until you get to the next topic, Enrollment, on E-13. Why doesn't that alone suggest that a reasonable person would have no idea that this eligibility for people who elect Early Retirement applies to someone in Local 15? Because you have to look at it in the context of the entire SPD. On page—or Joint Appendix 662 provides the definitions and the explanations for one's initial eligibility as a Local 15. I say that generically as a Local 15 operating engineer. Yeah, fair enough. And this is also, Your Honor, is within the record of Mrs. DeRogatis understanding the concept of how coverage accrued under the plan. And even her original expectations, short of when she speaks to Mr. Lopez, as to when the eligibility of her husband shall expire. She was under the impression up until when she meets with Mr. Lopez that she has coverage—or I should say she and her husband had coverage through April 2012. Whatever impression she had, why would a reasonable person necessarily assume that that is an unambiguous aspect of the plan? When, as I look at the plan, a reasonable person might either—wherever she got her impression that it would continue through April—a reasonable person might look at this and never find that provision at all. And if she found it, might reasonably think, well, I think that applies to me. It's about Early Retirement, and that's my topic. On the other hand, it doesn't seem to—it's not listed under 15 eligibility. It's listed under 15D eligibility. Then you go see Lopez, and suddenly you're told it doesn't apply to you, apparently, because you're going to lose your benefits. Because between pages 665 in the Joint Appendix through 668, the sections with regard to A, C, and D for eligibility requirements for so specific divisions of the union are spelled out based upon the number of hours they want. Can you explain to me why it is that when I get to Early Retirement or the previous subheading about Normal Retirement, that's in the same size as all of the subheadings of 15D? Why would I think that that is not still a part of the eligibility for 15D? Because in between those two sections, there's a section you already referenced, Your Honor, regarding reciprocity. And the reciprocity section was culminating the requirements of reciprocity for all divisions of Local 15. And coupled there after that, there's only these particular sections that start on page E8 of the SPD Joint Appendix, page 669. Fair enough. I see what you're saying, but why would anyone think that is unambiguous? Because it's the only place you can get specific information. It only shows up once in your SPD as to what your requirements are to receive regular pension, if you will, and Early Retirement pension, if you will, or if you want to apply for Social Security Disability Award, which starts on the next page. There is no redundancy. Maybe there are no such requirements for Local 15. Maybe it just doesn't matter. Maybe once you're eligible under 15, you're eligible forever. Why would anyone look there in this plan, which has a very confusing format? Because the expectations of every participant of the plan is that some day in time, they're going to be eligible for certain types of pension benefits. And what starts on this page E8 are those specific types of benefits that are available under ERISA and under the Local 15 pension plan. And what tells me even to look at that? Well, you go on to the next page. You identify under the terms of eligibility. I mean, granted, as we wrote in our brief to Judge McMahon, there is not a traditional table of contents. There is a color code. Nor index. Nor index. Nor section labeled retirement. Correct, but eligibility rolls into the different rules with regard. They identify the different types of pensions through the terms eligibility. It's 156 pages long? Yes, and unfortunately, Your Honors, I work with lots of SPDs. This is where SPDs are now. The documents themselves, which once upon a time were simplistic in the sense of 30 pages or broke down benefits very succinctly. Are they now text searchable online? I don't know of the 15. Back then, I am sure that this document was not searchable online at that time, but I wouldn't be able to tell you, Your Honors, whether or not that's the case now today with that particular document. Let's start out and say call the welfare office in New York. Yes, and going back to the earlier questions, then the case law shows that there's plenty of opportunities and plenty of scenarios whereby participants go to what I'm going to identify Mr. Lopez being a ministerial employee under the statute for purposes to inquire about what your plan of benefits are. How do I become eligible for these benefits? As Mr. Lopez testified, he would often answer questions. How do I keep benefits or obtain benefits upon retirement? Those are the expectations of participants of the plan. His answer here was notably inadequate. As Judge McMahon found, she said, we will go upon the premise that the answer is inadequate or it's misleading, and then the scenario under Becker becomes whether or not the court determines that the SPD provides the clear information so that it can contradict, so to speak, the misleading or the incorrect information that's provided by the ministerial employee. And as Judge McMahon found, we would suggest that the court should concur and affirm that this SPD had that information in there. Surely if there was some typo such that bizarrely the heading on this was, oh, I don't know what would be in the SPD on medical benefits, but something like how to get approval for an operation, that just somehow it had been transposed inaccurately and that was there. Surely you would not in that case be telling me that because under that misleading heading, you had a very crystal clear explanation of this particular problem about retirement benefits that a member, a participant in the plan should have found it. As I understand, Becker, Your Honor, hopefully I'm answering your question, that you need those two, you need two, there's two triggers. There are two components to it. Right. One is that the misleading information from the employee coupled with an SPD does not provide the answer or provide a clear answer to the information. You're saying you would be contending under my hypothetical that the fact that what it says is clear, even though no one looking for this answer would ever look there, that would still be okay. I would disagree respectfully with the last component of that hypothetical or that statement, Your Honor. I think the information is there. Participants are very well versed in what the terms of their health coverage are. They understand their rules for eligibility. What in the record tells us that participants, and Ms. DeRogatis in particular, are extremely well versed in what the health plan covers? Yeah. At 243, the joint appendix, she was asked questions with regard to her understanding of the benefit structure. And starting on that page, her deposition testimony is that she understood the process by which stamps would be submitted and redeemed. And, candidly, that's a whole other, I could explain to you how a stamp works, but she actually did a very good job in her testimony comparing it to the SNL or SNH green stamps. And she proceeded from there to say she understood that based upon the hours being redeemed, coverage was extended for a certain period of time in the future redemptions of stamps by her husband. And she understood it so well that when Mr. Lopez said you're going to lose your medical benefits, she didn't for a moment question it or say, but wait a minute, I understood that it was this way. Why are you telling me that? And there's nothing in the record that reflects that that portion, that type of a conversation occurred. But, again, I would fall back to Becker and say that if that was a bell and a whistle that went into her head, once Mr. Lopez says to her, hey, don't retire now. If you retire, you're going to lose your health coverage, which in certain respects is actually an accurate comment. It's the issue of what else is around that comment and what else is around the conversation, which doesn't seem to be very much information on either side as far as exactly what they specifically talked about. If the presider would allow me one more question. I would like to hear your argument, if you have one, or if it's the contention that you're making, that assuming that we concluded that there was a problem here, that the SPD was not clear enough and there was misleading information provided, are you arguing that nevertheless there is not an available remedy against the welfare fund in the form that Mr. Libros was arguing for? On the relief issue itself? Yes. Again, I apologize. We didn't brief it before, Your Honors, but my recollection of the brief before Judge McMahon on the issue, which he obviously didn't have to address, is I find it cannily a difficult relief to provide. It may be. I think it's a puzzling issue. It is puzzling. There's a problem. Excuse me. If you didn't brief it to us, have you waived that kind of argument, or is that something that if we disagree with you about the application of the state of Becker, we would then have to remand to the district court to fashion appropriate relief, and then you'd still be able to make those arguments? I would say yes, yes, Your Honor. Fine. I mean, there was nothing in either appellant's brief or ours addressing surcharge. But you have not argued to us that assuming that we disagree with your arguments on the liability merits, if you want to call it that, you have not argued to us that the relief that Mr. Libros seeks here is not available. That's correct, Your Honor. Very good. Thank you for your time. Thank you very much. Mr. Libros, you have three minutes rebuttal. Thank you, Your Honors. First, may I ask the Court if they have any questions of me in light of my brother's argument? Well, maybe one is to address that question of remand. Suppose, and this is a purely hypothetical question. I'm not telling you what I think because I don't know what I think yet, and I certainly don't and my colleagues think about the liability issue, if we want to call it that. With respect to remedies, if we were to agree with you that this case falls within the state of Becker in the sense that the fund has violated some kind of duty, you have said, well, the remedy is they should pay damages in the nature of equitable, I guess we don't call it damages because it's equitable, but something like damages in the amount of the missing 50 percent pension benefit should come from the welfare fund. That's your proposed relief. If we reach that issue, your adversary says, well, then the question of remedy is something the district court did not address. They raised this issue in the district court. We should remand and let the district court take first crack at that. What do you say to that? Because I don't even remember in your brief an argument in the nature of what you said here about remedies today. Maybe I missed it or wasn't focused on it. So should we in that event send it back to the district court, or do you think the law is somehow so clear that we should just say, yeah, reversed summary judgment for the plaintiff, or no, I guess not summary judgment, because it's not fact issues about what actually was said and what actually went on. Well, actually, I don't believe there are any, with respect to your question about remedies, the remedy issue is intertwined with how the court disposes of the pension fund case, because if the court ends up ordering, reverses, vacates the summary judgment. This case becomes moot in effect. If the court orders that the pension fund can be held, is liable, or if on remand the district court were to order the pension fund to be paid, and we'll be arguing in the pension fund case that the court has the authority to order, in the pension fund case, a remand for the purposes of remanding to the plan for calculation of damages, under the Swayback case, inherently interfering with the submitting of the application and benefit election form. It's a hard question. It's a hard question, but assuming it wasn't intertwined, I believe that in light of the Supreme Court's authorization of make whole relief, and if the court were to believe that Justice Breyer was, in writing Amaro, was referring to Professor Langbein's article that he had joined Justice Ginsburg's opinion in nine years earlier, in describing make whole relief, I think the court does have the authority to order that relief would be whatever pension benefits are not recovered from the central pension fund, whatever the difference is between what she's getting and what the benefit would be under the central pension fund, is the appropriate measure of damages. Depending on how we resolved each case, because they are intertwined, there would be a lot of different possibilities as to what happens next. But the court could, in principle, the court could order that the measure, or state that the measure of damages is consequential damages, in light of Professor Langbein's fairly comprehensive and authoritative article. I hear what you're saying. I'm sorry. I think I have your argument on that. Thank you. Very good. Then we're going to proceed then to the pension fund. Yes, Your Honor. Okay. Thank you. Thank you.